Case number 20-1319 et al. Wendt Corporation petitioner v. National Labor Relations Board. Ms. Schroeder for the petitioner, Ms. Roger Foxa for the respondent. Good morning, counsel. Ms. Schroeder, you may proceed when you are ready. Good morning, judges. May it please the court. As noted, my name is Ginger Schroeder of Schroeder, Joseph & Associates, and I represent the petitioner, Wendt Corporation. Almost 20 years ago to the day, Judge Edwards heard oral argument in a case where he noted that the NLRB in a substantive area of law had, quote, come full circle. And when he wrote the decision in that case, he penned an observation that has often been cited in cases by the D.C. Circuit and other courts, that it is a fact of life in NLRB lore that certain substantive provisions of the NLRA invariably fluctuate with the changing composition of the board. And I would submit that nowhere is that inconvenient fact of life more apparent than in the development of the controlling case law on the issue of past practice, and particularly with respect to the factual issues governing my client's obligations under the temporary layoff that occurred in 2018. I think over time, particularly the past decade, employers have been wondering what set of facts are actually going to privilege them to claim a past practice, such that they can act consistent with that and have the privilege of unilateral action or unilateral imposition. And I think that looking at the last 10 years of case law, discerning a past practice is a bit like, well, it's a bit like changing a tire on a car rolling downhill. So we have the backdrop of cats, and if you look at the decision in Raytheon, you'll see that the myriad of cases that have dealt with this. It says, in some, and for the reasons stated above, we overruled DuPont as well as Beverly One and registered guard, and we reinstate Shell Oil, Westinghouse, Winn-Dixie Stores, Beverly Two, Capital Ford, and the Courier Journal cases. Finally, when you look at the transition of those cases over time, just seven weeks before my client had the temporary layoff, we have the decision in Raytheon, and that, I think, privileged my client to deal with the layoffs in the manner that it did. In Raytheon, the court declared the DuPont standard very unworkable. And in the numerous decisions where boards and courts have interpreted cats, which is the Supreme Court precedent in this area, they really all support the view that when determining whether an employee action constitutes a real change, and thus triggers the obligation to provide the union notice and an opportunity to bargain, really the only relevant question that we should be asking is, is that action similar in kind and degree to what the employer did in the past, such that employees would understand what was going to be the circumstance and what was going to be the response? In Raytheon, the circumstances in that case- So we're going to go into our whipsawing back and forth in how the board has treated the focus of the inquiry. So here the claim is that the employer unilaterally transferred work out of the unit. Wendt's response is, oh, we have a longstanding practice of allowing some workers outside the unit to do some of the work that the unit employees do. And when we promote these three shop employees, they're consistent with the past practice of allowing non-unit employees to do some work. Board says, no, no, you've transferred work out of the unit by creating new positions and promoting people into it. Past practice supporting that, I did not see Wendt as providing evidence of any comparable prior removal from the work unit. I know that's the second reliance that you have on past practices, but there isn't any past practice referred to. Is there in the record of Wendt doing that kind of thing, removing work from the unit? So with respect to the, I believe your honor is referring to the supervisors, the creation of the supervisory positions and the failure to backfill the positions of the lead men. Or failure to negotiate over that change, yeah. Correct. That, the board would have to show that that was a, there was a material loss of work. And if you look at appendix 72 and appendix 792 through 795, that demonstrates that the unit work that was performed by those employees combined to only one half of a full-time position. Right. So that's not a material change. So that's really, with respect to that, that's the position that you're relying on is just that it's de minimis, not that there was in fact a past practice that was acceptable on this point. Well, we certainly did provide some evidence in the record relating to other supervisors who performed work. For instance, in the- Right, but not that work was taken out of the unit by a change in the way the workforce was organized. On your principal argument about relying on past practice, it's about the layoff practices. Correct. And again, reading all of the board's precedent as not a zigzag, but just a body of precedent, it does not appear that two temporary layoffs over 17 years is a kind of established past practice. At least none of the cases that I read, Raytheon or Katz or Mike Sells or the cases that they themselves cite seems to recognize that kind of intermittent and far in the past practice as the kind of, what do they call it? Dynamic status quo. Dynamic status quo, Your Honor, yes. That the past practice doctrine is meant to embrace. So I'd like to address that because you really, Your Honor, get right to the crux of the problem. The administrative law judge in this case did not actually analyze at all the issue of the past practice of layoffs. And in fact, gave very short shrift to it. That caused the board to almost do really a de novo review. They said themselves that they were going to do a careful review of the record. Well, their careful review of the record had factual inaccuracies that were not supported by the record. So if we look at appendix 612 through 613 and 824 through 843, we will have layoffs that occurred in 2001, 2002, 2003, 2005, 2009 and 2015, all predating the 2018 layoff. Very conveniently, when the board did look at the layoffs that it actually found in the record, it dismisses in Likert substance, the 2015 layoff by saying, well, that was permanent in nature, so therefore it doesn't count. I'm suggesting to this court that when we're looking at the issue of past practice, we have to look at the circumstance and we have to look at the employer response. The circumstance that Wendt is faced with being in a very cyclical recycling industry is downturn in work beyond its control. The recycling industry goes up, it goes down. How does Wendt respond to that? By laying off employees when it hits the valleys and by taking them back when it hits peaks or even hiring temporaries when it hits peaks. The board did not deal with those layoffs at all. So if we look at 2001, we had five people laid off. 2002, we had two. 2003, one. 2005, two. 2009, six. And 2009, the board would like you to ignore the 2009 layoff as well by saying, well, there they laid off both unit workers and supervisory workers. So it's different in nature and kind than the other layoffs. And what I'm suggesting- It's interesting, you're referring to, I mean, not even in your brief to us, do you refer to all of those. You referenced, I think, five layoffs. The board says 2002 and 2003 layoffs. There were no sizable group of people. I didn't see your brief making any serious effort to combat the distinction the board relies on there. And we review the board, especially on this kind of fact-bound, record-bound issue just for substantial evidence and with a lot of deference. So when you bring up straight from the record and not even in your brief, some larger body of putative practice in this area, I don't really see precedent that allows us to reach through the record, the argument you made in your brief to us, and just sort of consider that de novo. With all due respect, Judge Pillard, what I just read was from my reply brief down at the bottom of page three, going to the top of page four, and I specifically cite those pages in the appendix that have those exact documents that were respondents' exhibits in the underlying trial. I actually was somewhat surprised that the board would have taken the position that our layoffs were not the same or similar in kind and substance to what had occurred in the past. Layoffs are not something that, like in Raytheon, where they're every year facing a healthcare implementation and they're making changes to that healthcare plan every year, layoffs are very circumstantial. And that's why I think we need to look at circumstance, decline in work, and what whence action was. And even the testimony of our witnesses in the underlying trial specifically noted, and the board and certainly the general counsel never put in a single bit of evidence as to anything different that went did when faced with a downturn in work. There's a dearth of evidence on that. Do my colleagues have further questions for Ms. Schroeder? I do not. All right. Thank you, Ms. Schroeder. We'll give you a brief amount of time for rebuttal. Thank you, Your Honor. Ms. Radjaposki. Thank you. I'm sorry, I just butchered your name. And I'm guessing I'm not the first person who ever did that. No, you're not. And you actually did quite well. May it please the court. My name is Meelakshmi Radjapaksa. I'm counsel for the National Labor Relations Board. This case involves the board's findings that went committed numerous unfair labor practices in the first year after its employees designated a labor union as their collective bargaining representative. Most of the unfair labor practices at this point are uncontested. And the board, of course, seeks some reinforcement of its order as it corresponds to the uncontested unfair labor practices. With regard to the contested findings, I do wanna focus on the unilateral changes that were the subject of Ms. Schroeder's discussion with the court today. In terms of the past practice defense, Judge Pillard, I do think that you correctly identified the problem that Wendt faces, which is that in Raytheon and Mike Sells, the board didn't fundamentally change the quantum of evidence, so to speak, that the employer has to put on in order to establish a past practice in the first place. So the company at minimum has to show that the overall frequency and number of past events amount to a past practice. And if you look at the removal, the unilateral removal of work, the company certainly did not clear that bar. When you read the earlier decisions, they seem to talk about this dynamic status quo, the idea that there are gonna be things that are gonna have an impact on terms and conditions of work like changes in the amount of premiums and the benefits that one gets under the same status quo health plan. That makes sense to me. This notion that we're gonna unplug from that and just say overall frequency and number of events could be a past practice. Is there any way you can help us understand that this isn't just some random number cutoff or frequency eyeballing by the board? Well, the board is bringing its- I guess I'm saying I'm a little surprised that something like a layoff, which as Ms. Schroeder explains can be very important prerogative for a business, but also is not something that is sort of a dynamic status quo. It's very circumstantial. Like how could that ever be part of this, this doctrine of past practice? So with the board, the board confronted this very type of issue in Mike Sells. And Mike Sells involved an irregular practice, sort of like the layoff that we're confronting in this case or the practice of layoffs, the so-called practice. In Mike Sells, the issue was some subcontracting decisions which don't occur annually or at set intervals. But the board said that in order to honor employees' right to bargain collectively about changes to the status quo, there has to be some minimal showing that the number or frequency of past events amounts to a practice that employees could have expected. So in the Mike Sells, the facts were that there were 51 subcontracting decisions that were made over a period of 17 years. And even though the decisions were not regular, even though in some years there may not have been decisions made, overall looking at the prolonged period, there were a sufficient number of events. The board took the same approach in this case. It considered a similar 17-year period and how many layoffs took place in that 17-year period. And the Raytheon decision enters into the analysis because the issue is not just number and frequency, it's also comparable events. Under Raytheon, the board was very clear that the past events cannot materially vary in degree or kind from the event at issue. So the board, it was entirely fair for the board to look closely at the particular layoffs that the company is citing. The thing I'm perplexed about is that the company is arguing that it has been their consistent practice over this period to lay off employees due to a lack of work. Well, you can't demand a certain number because part of the equation is a situation involving lack of work. And what they said was when there was a lack of work, they routinely reduced their workforce. And that was not refuted by the board. And so within the time period looked at, I don't know what more you could expect the company to do. And they also subsequently pointed to the handbook. I'm not sure we can even consider that, but in any event, they said, when there has been a situation in which there has been a lack of work, we have laid employees off. And I think the case that you're citing, Mike Sell, I wasn't persuaded that's in any way inconsistent with what we're talking about. We're talking about a situation here when there is a lack of work, we lay people off and it's not an insignificant number, but it's consistent. The company's position is consistent. There's nothing to indicate there are circumstances when they did other than what they claimed when there was a lack of work. Right, the issue for the board is there has to be some, this occurrence that you're talking about, Judge Edwards, is relatively infrequent, right? The occurrence of temporary layoffs of shop employees happened twice in the past. And so, yes, 100% of the time- No, it was more than twice. No, the, well, the- 2001, two, three, nine, 15. Well, two- And 18, 18 as well. 2002 and 2003 are admittedly the layoffs of a handful of employees at most. What we are talking about in this case is a layoff of one third of the shop, or 10 if we- Well, the number of employees who are gonna be laid off is gonna be affected by the economic circumstance. I'm not, I don't know what you're telling me when you say there were only a few in 2001. So what? That was all that was required because of the nature of the economic circumstance. You wouldn't lay off more than was necessary in any of the years when you had to lay off. But what they are saying is whenever there was a change in our economic situation, we would lay off employees, whether it was a handful or a whole department. It depends on the economic circumstance. Right, so there are two sort of prongs to the past practice analysis. One is the nature of the past actions, the degree, the similarity of degree and kind. The other prong is frequency or number. So I think we're talking, we're kind of mixing two different things. The 2002 and 2003, and to the extent you wanna think about it, 2005 unfair labor, or excuse me, past practices were not similar in degree and kind to the layoff. Because those involved at most, one, two, three employees, this particular- Again, I'm repeating myself. I don't know why that matters. It matters because under the law, the past actions have to be comparable. They have to be comparable- Because the duty to bargain obligation wouldn't allow them to, whether it's one, two, or three, doesn't matter. The duty to bargain would be there if they didn't have the past practice. Whether it's one, two, three, or 103, they would have to bargain. Well, the issue is- And what they're saying is in the past, whether it's one, two, or three, or 103, we have always laid off as necessary. Those are- It seems to me perfectly comparable. And the number of employees affected depends upon the economic circumstance that the company is faced. And there's nothing to indicate the company is playing games there. They were honestly pointing to situations where there was an economic downturn and they reduced an appropriate number. They're saying, and here there was an economic downturn, not contested, and we reduced an appropriate number. That's the practice that we're looking at. It would make no sense to say you have to show that there is a practice of, how many did they reduce here? 20? You'd have to show 18 times in which they reduced 20 employees in order for there to be a binding past practice. That's a ludicrous rule. That makes no sense. Judge Edwards, I would respectfully say that you have to look at the policy behind this requirement of similarity and degree in kind. The purpose- Duty to bargain. Well, it is the duty of bargain, but it's also that the question is if you have the past actions forecasted essentially for the union and employees, this kind of action is going to happen. It's a recurring sort of thing. No, no, no. When you say recurring, you have to be careful, I think, when you say recurring. Recurring has to be read with reference to the condition that is economic downturn. So it will recur as there are economic downturns. You can't demand that the company show that there were economic downturns every year in order for the practice to be binding. And the board didn't do that. The board didn't impose that requirement. Okay, so it seems to me there are an awful lot of occasions here where the company has said, and the board's kind of dismissed it. I think in one they said, well, one involved both shop employees and non-shop employees. That was 2009, right? I read that and I laughed. I mean, why is that relevant that it involves shop and non-shop employees? The point is they're saying it involves shop employees, which is what we did here. We have a... And so the board dismisses one of their examples. And there was another ludicrous dismissal too. All situations in which the company is saying there was an economic downturn and we have consistently let people go during economic downturns. There's no instance in which we have not. We're not doing anything different here. And the number of employees let go depends upon the nature of the downturn. That seems reasonable. The board looked at sort of whether these past actions would have given the union and employees notice that, aha, this is what the employer does. This is how it would handle a temporary layoff. And the problem is- Wait, wait, wait. How it would handle a temporary layoff or would have a temporary layoff? That it would have a temporary layoff and what would happen in the temporary layoff. There was no union before. Right, but- So you're not... So you can't bring that into the equation. So there was no obligation to bargain. So the employees don't have an expectation of a duty to bargain because there was no union. So that's not in the equation. The issue is what was the status quo, right? What is the status quo as to these temporary layoffs? And you have to look at the two temporary layoffs to understand so that the employees and the union could understand, oh, this is what is going to happen. This is what the employer will do. There's nothing to bargain about. We already know. And in this situation, all the board is saying is the employees and the union could not have known from two prior instances- What are you saying they could not have known? They could not have known that the employer would reduce, would, excuse me, reduce the staff in the event of an economic downturn. That it would reduce- I don't think these employees had reason to know that. That would have a mass layoff of one third of the bargaining union. No wait, mass or laying off employees appropriate in number to the economic situation before the company. That's the way I would define the practice. Well, the board defined the relevant action that it was looking at as a temporary layoff that affected a sizable group of employees. Here it was 10. So there were other sizable layoffs, but there were three. One of them was a permanent layoff. Why does that matter that it's permanent? They are reducing the labor force with reference to an economic downturn. And what the employees know, if there's an economic downturn, they're going to reduce the workforce. Maybe permanent, maybe temporary, but they are going to reduce the workforce. So that's three we have. Now, how are you dismissing the other two? Well, I'm not dismissing them. I'm just saying they're not sufficient. Two temporary layoffs are not sufficient. No, they're five. 17 years. The other layoffs are affected. They were essentially one-off decisions to lay off one, two, maybe three employees. They are not comparable to the decision to lay off 10 bargaining unit employees. And I guess it's a matter of definition. Ms. Rajapaksa, I'm curious about the implications of this in the sense that, so the point of the past practice is that it excuses a duty to consult with the union that would otherwise apply. And in Mike Sells, the board says, of course the union can request a bargain over whether to change the practice itself. So had the employees in this case, or the union in this case, like I guess one question is how do they know that this would be treated as a past practice and a defense before the board? But if they want to going forward, they can ask, say like, no, we think when the employer is laying people off in response to economic downturns, that it should come and talk to us about it. That's important to our terms and conditions. So it is not, I mean, I'm just having a little trouble processing that comment in the end of Mike Sells and how it works, because as I understand from Raytheon, the point of this past practice doctrine is that it is not a change in working conditions that is subject to bargaining if something is a past practice, but it can nonetheless be put on the table by the union. Right, so the union can bargain over changes to the status quo. So there is, I think all that Mike Sells was saying, it was clarifying really, because there was some confusing language in Raytheon on this point. The employer has a right to maintain the status quo as to its past practices. However, if the union requests bargaining about a past practice and proposes, for example, changes to that practice, there is a duty to bargain over the issue going forward. So- But if they don't change the past practice, if they just, if the employer keeps the past practice consistent, that does not create an opportunity for, for example, newly unionized workforce to say, hey, we see that as a big deal. We want to bargain over that. No, they can request bargaining over that. They can request it immediately. As soon as a company announced it was going to lay off, the union can come in and say, we want to bargain about it. And the company would have to bargain about it. And they just are bargaining over the past, whether the past practice should continue. It seems like, I guess I'm having a little trouble because it feels like a very formalistic distinction to say you can bargain over whether the past practice continues, but you can't bargain directly over layoffs that the employer characterizes as consistent with its past practice. Well, you can, I mean, the parties can bargain over both the implementation of the current decision to lay off as well as the issue going forward. But the point of the Mike Sells case, for example, is that the employer can go ahead and unilaterally implement. Unilaterally, they don't have to reach impasse. You don't have to bargain impasse, but the union can still come in and say, we understand you're following what you think is a past practice. We want to bargain about it. The company would have to bargain about it. But the company is saying, we did not have to reach an impasse over something that we have consistently done, even though there's now a union here. And I don't see why, I don't see how you get over their claim that there was a consistent practice of we will let people go in the event of an economic downturn. I just don't see it. The distinctions you're raising seem really very strange to me. There were only several people, some at one occasions it was permanent and not temporary. They're distinctions without meaning. Well, the requirement of similarity between various past events and the current event is in Katz, for example. There's no question about it. But we're talking past each other, so I will stop. But what I am saying is similarity is measured by reference to how you define what we're talking about. And the company says, what we're talking about is our right to let people go when there's an economic downturn. And they would say, so is this similar? It is similar, because we let people go during an economic downturn. You're trying to nitpick it to the point and say, no, no, no, we have to count the number of employees. We have to count which days they will let go. We have to count whether they were men or women. We have to look at the weather. That's not what the Katz rule is. Well, I respectfully have to disagree, Your Honor, because the board's decision is written as it is. However, I will say to the extent that the court disagrees with the board's framing of the past practice, the board would appreciate a remand to consider whether five past instances is enough to amount to a past practice that would have sheltered the unilateral action from bargaining. So I see that- Yeah, other further questions for Ms. Roger-Poxa? No. Ms. Schroeder, we will give you two minutes for rebuttal. Thank you, Your Honor. It's very clear from the questions and the responses exactly what the issue is in this case, and I don't wanna belabor it too much. I just think it's very easy in the business world for the board to sit in hindsight and then to nitpick as Your Honor, Judge Edwards points out, was it five people? Was it four people? Was it for three days? Was it permanent? Were salary people let go at the same time as unit people? There would never be any past practice because everything is dependent upon the circumstance. And so I'm asking that we really look at the Mike Sells case and say, what we're concerned with here is, what is the circumstance? What is the employer's response? And that is the consistency that we need to look for. And I submit to this court that my client did exactly what it had done a good number of times in the past when faced with this circumstance, and it would have been very clear to anyone because there was no other evidence in the record to the contrary, that this is what was going to happen. Thank you very much. Thank you both. The case is taken under advisement.
judges: Pillard, Wilkins, Edwards